Lionel AMRON, Chana Yampolsky, and David Yampolsky, Plaintiffs–Appellants,

v.

MORGAN STANLEY INVESTMENT ADVISORS INC. and Morgan Stanley Distributors Inc., Defendants–Appellees.

Docket Nos. 04–3938–CV(L), 04–3940–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: April 28, 2005.

Decided: Sept. 26, 2006.

been paid down by the time of suit.

**340**

Joel C. Feffer, Wechsler Harwood LLP, New York, NY, for Plaintiffs–Appellants.

Richard A. Rosen, Paul, Weiss, Rifkind, Wharton & Garrison LLP (Roberta A. Kaplan, on the brief), New York, NY, for Defendants–Appellees.

Before: SOTOMAYOR, B.D. PARKER, and HALL, Circuit Judges.

HALL, Circuit Judge:

This case requires us to examine the pleading requirements for an action alleging breaches of fiduciary duty under section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.* (the "40 Act"). Plaintiffs Lionel Amron, Chana Yampolsky and David Yampolsky filed a complaint alleging that Defendants charged unreasonably high fees in violation of the 40 Act. They now appeal the judgment of the United States District Court for the Southern District of New York (Richard Owen, *J.)* entered on June 25, 2004, granting Defendants' motions to dismiss the claims.

We affirm the dismissal of both complaints.

## I. Background

The Complaints at issue in this appeal arise out of the poor performance of two mutual funds, the Morgan Stanley S & P 500 Index Fund (the "S & P Fund") and the Morgan Stanley American Opportunities Fund (the "AO Fund," and, together with the S & P Fund, the "Funds"). The Funds are part of the Morgan Stanley family of funds and share a common investment advisor, defendant Morgan Stanley Investment Advisors Inc., and a common distributor of fund shares, defendant Morgan Stanley Distributors Inc.

In the summer of 2003, plaintiffs Chana Yampolsky and David Yampolsky filed a Complaint on behalf of the AO Fund (the "Yampolsky Complaint"), and plaintiff Lionel Amron filed a Complaint on behalf of the S & P Fund (the "Amron Complaint," and, together with the Yampolsky Complaint, "the Complaints"). Both Complaints were filed in the Southern District of New York; both contained fundamentally similar pleadings; and both claimed the Defendants had violated their fiduciary duties under section 36(b) of the 40 Act, 15 U.S.C. § 80a–35(b).

To violate § 36(b) an "adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir.1982). As discussed in detail below, courts consider six factors in applying this standard. These are: (1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees. *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir.1989) (citing

*Gartenberg,* 694 F.2d at 929–30) (the "*Gartenberg* Factors"). The Complaints attempt to track those factors.

### 1. The Yampolsky Complaint on behalf of the AO Fund

Regarding the first factor, the nature and quality of services, the Yampolsky Complaint alleges that the 2002 after-tax loss of AO Fund Class B shares was 26.94%, while the corresponding drop in the S & P 500 Index—an index commonly used as a benchmark in order to measure the performance of the overall stock market—was 22.09% during the same period. Over the preceding five years, AO Fund Class B shares averaged an annual loss of 3.67%, while the S & P 500 Index lost only 0.58%. Over the preceding ten years, while the S & P 500 index gained 9.35%, the Class B shares gained only 4.95%. In 2002, Plaintiffs allege, the AO Fund paid more in fees to its adviser than it earned in investment revenue (dividends & interest) during that same year. Yampolsky also asserts that the Rule 12b–1 fees paid to the Morgan Stanley Distributor confer no benefit on the Fund, which we take to mean that the services thus procured were of no value.

Regarding the second factor, the profitability of the fund to the adviser-manager, the Yampolsky Complaint alleges that because public information is lacking, "this issue must await discovery." Nevertheless, Plaintiff speculates that the "sheer enormity" of the fees suggests the fund advisors received "significant profits." Plaintiff makes similar speculations regarding other fees Morgan Stanley might have earned through sales commissions.

Regarding the third factor, fall-out benefits,[1] the Yampolsky Complaint again claims that it "cannot plead any facts" because of the absence of public information.

Regarding the fourth factor, economies of scale, the Yampolsky Complaint pleads no new facts specific to the AO Fund. It notes, however, that fund fees across the industry have generally been criticized as high and impervious to economies of scale. The only mention of the AO Fund is an unilluminating comparison to fees in the 1960s: "[T]he Adviser's fees ... coupled with the Rule 12b–1 fees paid to the Distributor ... far exceed the fees found exorbitant during the 1960s. The [AO] Fund, consequently, is a paradigm of ... a counter-intuitive example of a lack of economies of scale."

Regarding the fifth factor, comparative expense ratios and advisory fees, the Yampolsky Complaint notes a general industry trend of high fees and alleged that the expense ratio for the Class B shares was 1.67%, compared to the mean industry expense ratio of 1.51%. It further alleges that "even in an industry marked by bloated expense ratios and fee gouging, the [AO] Fund stands out." The Complaint further alleges that some fees may remain undisclosed, and that those undisclosed fees may make the actual expense ratio even higher.

Finally, regarding the sixth factor, the independence and conscientiousness of the Fund's trustees, the Yampolsky Complaint alleges that five of the purportedly independent directors are not actually independent at all. Their independence has been compromised, Plaintiffs allege, because each serves on the board of at least 123

---

1. Fall-out benefits are benefits to the adviser "in the form of commissions on non-Fund securities business generated by Fund customers and interest income on funds (known as the 'float') held by the Broker from the date when a redemption check is issued by the Fund to its customer until the date it clears." *Gartenberg,* 694 F.2d at 932.

different Morgan Stanley funds; each receives at least $159,650 in annual compensation from Morgan Stanley; each is entitled to a retirement package from Morgan Stanley; and each sits on other corporate, civic, and charitable boards. The Yampolsky Complaint alleges in the alternative that each trustee "is the functional equivalent of an employee of Morgan Stanley and its affiliates."

### 2. The Amron Complaint on behalf of the S & P Fund

The Amron Complaint is largely identical to the Yampolsky Complaint. As to the first *Gartenberg* factor, the nature and quality of services, the Amron Complaint alleges that the S & P Fund's annual return between 1995 and 2002 was 4.11%, while the return of the S & P 500 Index—which the S & P Fund aspired to mimic—was 6.07%. The S & P Fund, Plaintiffs allege, was in the "bottom 20% of all comparable funds during both the one year and five year periods ended July 31, 2003."

Regarding the second factor, profitability of the fund to the adviser-manager, the Amron Complaint, like the Yampolsky Complaint, pleads no facts, but speculates that fees are high.

Regarding the third factor, fall-out benefits, the Amron Complaint, like the Yampolsky Complaint, pleads no facts.

Regarding the fourth factor, economies of scale, the Amron Complaint mirrors the Yampolsky Complaint, containing the same allegations about industry fees and a comparison to the same fee figure from the 1960s.

Regarding the fifth factor, comparative expense ratios and advisory fees, the Amron Complaint notes that the expense ratio is 1.67% for the S & P Fund, which is simply an index fund tracking the S & P 500 Index, while the expense fee for a comparable fund at Vanguard Group is only 0.18%.

Finally, with regard to the sixth factor, trustee independence, the Amron Complaint and the Yampolsky Complaint allege identical facts about the five so-called independent trustees on the S & P Fund's board, who are the same trustees that sit on the AO Fund.

### 3. The District Court Decision

The Defendants moved to dismiss both Complaints under Fed.R.Civ.P. 12(b)(6), and Judge Owen granted the motion in an unreported memorandum decision. *See Yampolsky v. Morgan Stanley Inv. Advisers*, 2004 WL 1065533 (S.D.N.Y. May 12, 2004). Judge Owen reasoned:

> Reviewing the factual allegations in the complaints, the pleadings rely heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders. As for factual allegations specific to this defendant, the *Yampolsky* complaint relies principally on the assertions that the fund underperformed as compared to the S & P 500 Index, had an unfavorable expense ratio, and that the trustees were poor "watchdogs." The *Amron* complaint similarly alleges unfavorable fund performance as the basis for relief.
>
> . . . .
>
> While both complaints track the *Gartenberg* factors, nowhere does either complaint, in sum or substance, indicate how or why the fees are "so disproportionately large that [they] bear[ ] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." For example, conspicuously absent from either of the complaints are any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants.

Instead, the complaints rely on speculation, inference and generalized observations about the securities industry from public figures such as Warren Buffet. Furthermore, plaintiffs' endeavor to avoid this shortfall by asserting that specific factual allegations are impossible without discovery has been expressly rejected in this district under similar circumstances.

*Id.* at *2 (internal citations omitted). On that basis, Judge Owen dismissed the Complaints. This appeal followed.

## II. Discussion

We review a Rule 12(b)(6) order of dismissal *de novo*. *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619 (2d Cir.1999). At issue in this appeal is the proper standard for review of a decision to grant a motion to dismiss.

Plaintiffs argue that their Complaints are sufficient to withstand such a motion, particularly in light of *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In *Swierkiewicz*, the Supreme Court emphasized that at the pleading stage a plaintiff must meet no more rigorous a burden than that found in Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See id.* at 512, 122 S.Ct. 992. As the Court held in *Swierkiewicz*, which was an employment discrimination case, it was improper to apply at the pleading stage of an employment discrimination case the evidentiary standard enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (requiring complainants in a Title VII trial prove, as an evidentiary standard, specific elements to establish a prima facie case of racial discrimination). Plaintiffs here contend that under the rationale of *Swierkiewicz*,

their pleadings are sufficient to survive at the pleading stage because the Complaints provide sufficient notice under Rule 8(a) of the basis of their claims.

■ *Swierkiewicz* is, without question, a potent reminder of a plaintiff's pleading burden. A complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 513, 122 S.Ct. 992 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Th[is] liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." *Id.* As this court has emphasized, "[a]ll complaints must be read liberally; dismissal on the pleadings never is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir.2005). The fundamental command of the Federal Rules of Civil Procedure is "never to exalt form over substance." *Id.* Dismissal is improper on technical pleading irregularities, which are excusable "as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party." *Id.*

■ At the same time, we stop well short of saying that Plaintiffs bear no burden at the pleading stage. A plaintiff must allege, as the Supreme Court has held, those facts *necessary* to a finding of liability. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In *Dura Pharmaceuticals*, the Court held that to prevail on a securities fraud action a plaintiff must prove that he suffered an economic loss and that the defendant's fraudulent conduct was the proximate cause of the plaintiff's loss. *Id.* at 346, 125 S.Ct. 1627. Critically, the Court further held

that a plaintiff must *"allege* these requirements" at the pleading stage. *Id.* In other words, a plaintiff's allegations, accepted as true, must be sufficient to establish liability. *See Swierkiewicz,* 534 U.S. at 511, 122 S.Ct. 992. As this Court has held, "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). We apply this standard when assessing Plaintiffs' claims under section 36(b) of the 40 Act.

■ To show that a fund adviser acted contrary to its fiduciary duty under section 36(b) of the 40 Act, a plaintiff must show that the adviser charged a fee "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.,* 694 F.2d 923, 928 (2d Cir.1982). The standard, however, is not a simple balancing of the size of the fee against the adequacy of the services. The scope and demand of the fiduciary duty is contextual, turning on the six well-established factors outlined *supra:* (1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees. *See Krinsk,* 875 F.2d at 409. Further, the 40 Act contains an express presumption that mutual fund trustees and natural persons who do not own 25% of the voting securities are disinterested, *see* 15 U.S.C. § 80a–2(a)(9) ("Any person who does not own more than 25 per centum of the voting securities of any company shall be presumed not to control such company"), and a plaintiff's "burden to overcome this presumption is a heavy one," *Strougo v. BEA Assocs.,* 188 F.Supp.2d. 373, 380–81 (S.D.N.Y.2002).

■ Here, the Complaints are insufficient to survive a motion to dismiss. Because they "have failed to allege any facts pertinent to th[e] relationship between fees and services," *Migdal v. Rowe Price–Fleming International,* 248 F.3d 321, 327 (4th Cir.2001), the Plaintiffs have not set forth those facts necessary to a finding that the fees were excessive. Regarding the nature and quality of the services provided, the Yampolsky Complaint alleges that the AO Fund has lost money, but it fails to allege the Fund's performance is appreciably worse than comparable funds. In comparing AO Fund share returns to gains and losses of the S & P 500 Index, the Yampolsky Complaint demonstrates little, if anything, about the nature or quality of the specific services offered to AO Fund customers. The Amron Complaint is less deficient, in part because it notes that over 80% of the S & P Fund's peers outperformed it and because the nature of the services the S & P Fund are not so demanding on advisers' expertise because the Fund seeks merely to mimic the return of the S & P 500 Index. But "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive," *Migdal,* 248 F.3d at 327, and Plaintiffs make scant additional showing as to the first factor in the Complaints.

Regarding the profitability of the fund to the advisers and fall-out benefits, the Complaints allege nothing. For obvious reasons, in establishing that fees are disproportionate to the services provided it is essential to allege the total amount of fees, which Plaintiffs fail to do. Their assertions regarding the size of 12b–1 and advisory fees, moreover, are irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds. *Cf. Krinsk,* 875 F.2d at 410 (discussing district court's treatment of 12b–1 plan fees "as a wash,

offset by the cost of payments to the personnel."). Instead, the Complaints merely pray for discovery on these points. Plaintiffs thus fail to make a showing for the second and third factors.

Similarly, the Complaints allege no facts related to the Funds regarding the question of economies of scale. The Complaints again point to the size of the 12b–1 and advisory fees, but make no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed. *Krinsk*, 875 F.2d at 411 ("[T]o show economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased."). Plaintiffs thus make no showing for the fourth factor.

Likewise, the Complaints' allegations regarding the question of comparative fee structures are inadequate. The Yampolsky Complaint alleges the AO Fund expense ratio is 1.67% while the industry mean is 1.51%, conveniently omitting where the AO Fund ratio falls on the distribution of fees. The Amron Complaint notes the S & P Fund's 1.67% expense ratio, but only compares it to *one* Vanguard fund. That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion under this fifth factor. *Cf. Gartenberg*, 694 F.2d at 929 (noting that because competition between funds does not necessarily imply the existence of competition between advisor-managers for fund business, comparisons of fee structures are of limited value in assessing whether the fees charged by any given fund are excessive; moreover, "[i]f rates charged by the many other advisers were an affirmative competitive criterion, there would be little purpose in § 36(b).").

Finally, regarding trustee independence and conscientiousness, the Complaints are also inadequate. They include quotations from the Fund Director's Guidebook, a product of the American Bar Association Section on Business Law, and quotations from industry leaders such as John C. Bogle, the chairman of Vanguard Group, and Warren Buffett, but the Complaints contain little, if anything, about how the five directors of defendants' Funds are controlled. Plaintiffs further allege that the five directors of the Funds each receive compensation in excess of $150,000, retirement benefits, and serve on the boards of many other mutual funds, businesses, and charitable organizations. These allegations, however, are insufficient as a matter of law. *See Migdal*, 248 F.3d at 330–31 (noting the 40 Act's presumption that natural persons are disinterested and explaining that serving on multiple boards does not demonstrate lack of independence).

In drawing this conclusion, we rely on *Scalisi v. Fund Asset Management, L.P.*, 380 F.3d 133 (2d Cir.2004). To establish derivative standing under the 40 Act and Maryland law, the plaintiffs there needed to demonstrate that a majority of the Merrill Lynch fund's directors would refuse to exercise good faith in examining the merits of the suit they sought to bring and would prevent the suit from proceeding. In their efforts to establish standing, the plaintiffs in *Scalisi* advanced assertions about directors' independence that are nearly identical to those the Plaintiffs make in this case. The *Scalisi* plaintiffs offered, *inter alia*, excerpts from a 1998 interview given by John C. Bogle, the founder of The Vanguard Group, broadly criticizing the mutual fund industry fee and expense structures and statements by Warren Buffet, broadly criticizing investment company governance. *Id.* at 141. The plaintiffs also offered excerpts from the Fund Di-

rector's Guidebook, published by an ABA Task Force, voicing concerns regarding director workloads and comparisons of defendants' expense ratios with those of The Vanguard Group and Fidelity Investments, as well as a general critique of expense ratios published in Forbes Magazine in 2002. *Id.* at 141–42. Finally, the *Scalisi* plaintiffs cited former SEC chairman Arthur Levitt's critique of the practice of mutual funds paying dues to the Investment Company Institute. *Scalisi* rejected these assertions: "These allegations are neither specific to the [Fund] directors nor to the purchase of the ... stock at issue. [T]hose generalized allegations do not suffice under Maryland's [derivative suit] standard to justify excusing a demand on this particular board in the case before us on grounds of futility." *Id.* The same holds true here.[2] Plaintiffs make an insufficient showing under the sixth factor.

Overall, we find the district court correctly determined Plaintiffs' assertions are inadequate to survive a motion to dismiss. Indeed, we decline to "permit [this] plaintiff 'with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence.' " *Dura Pharmaceuticals*, 544 U.S. at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). Even taking all of Plaintiffs' allegations as true, as we are required to do, the Complaints fall short of the standard to establish liability under section 36(b) of the 40 Act.

Accordingly, the judgment of the district court is hereby AFFIRMED.

---

2. We cannot help but observe that the Complaints filed in this case are strikingly similar to prior claims brought—including one in this Circuit—by Plaintiffs' counsel, all of which have been dismissed. As the Third Circuit noted in affirming dismissal of a virtually identical claim from the same plaintiffs' counsel, "This case is one of five virtually identical actions filed by Plaintiffs' counsel in district courts in four separate circuits. All of the other courts, including the courts of appeals for the Fourth Circuit and the Second Circuit, have rejected Plaintiff's arguments." *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir.2002).