GEORGE B. DANIELS, United States District Judge *159 Plaintiff Joan Pirundini brings this shareholder action under Section 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35, on behalf and for the benefit of the JP Morgan U.S. Large Cap Core Plus Fund (the "Fund"), against Defendant J.P. Morgan Investment Management Inc. ("JPMIM"), the Fund's investment adviser. (See Compl., ECF No. 1, ¶¶ 1-2, 12.) Plaintiff asserts that JPMIM owed a fiduciary duty to the Fund under Section 36(b) and that it breached that duty by charging the Fund excessively high fees in exchange for investment advisory services. (Id. ¶¶ 2-4.) Plaintiff seeks a declaration that JPMIM breached its fiduciary duty under Section 36(b), as well as damages, including restitution of the excessive fees, lost profits, and interest. Plaintiff also seeks rescission of the investment advisory agreement governing JPMIM's provision of services to the Fund. (Id. at 102.)
Defendant moves to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Mot. to Dismiss, ECF No. 14; Def.'s Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF No. 15, at 1-3.)
Defendant's motion to dismiss is GRANTED.
I. FACTUAL BACKGROUND
A. The Fund
The Fund is one of a series of mutual funds housed within the JPMorgan Trust I (the "JPM Trust"), a management investment company established by Defendant JPMIM and non-party JPMorgan Chase & Co. ("JPMC") in 2004.[1] (Compl. ¶¶ 14, 37-38.) Like all other mutual funds housed within the JPM Trust, the Fund has no employees of its own. Rather, its operations are carried out exclusively by external service providers who provide services to each of the JPM Trust's mutual funds, including the Fund, pursuant to separate contracts with the JPM Trust. (Id. ¶ 40.)
JPMIM is one such service provider. (Id. ¶ 41.) Under the terms of an Investment Advisory Agreement ("IAA") executed by and between JPMIM and the JPM Trust in August 2006, JPMIM provides the Fund with investment advisory services as described below.[2] (Id. ¶ 41.) In addition to its obligations under the IAA, JPMIM provides administrative services to the Fund pursuant to a separate agreement. (Id. ¶ 46.) As the Fund's administrator, JPMIM maintains the necessary office space for the Fund's operations and prepares various reports filed with the Securities and Exchange Commission ("SEC"). (Id. ¶¶ 47-48.) JPMIM is compensated *160 separately for the investment advisory and administrative services it provides pursuant to those separate contracts. (Id. ¶¶ 49, 57.)
The additional services the Fund requires to function, such as regulatory and shareholder-facing services, are provided by other external service companies, each of which are also separately compensated pursuant to their respective agreements with the JPM Trust. (See id. ¶¶ 43-45, 50-55.) For example, J.P. Morgan Distribution Services, Inc. ("JPMDS"), which serves as the distributor and shareholder servicing agent for each fund housed within the JPM Trust, has the authority to solicit and accept orders to purchase the Fund's shares. (Id. ¶¶ 50-51.) JPMDS also responds to shareholder inquiries, provides shareholders with information, and assists shareholders with other Fund-related services. (Id. ¶¶ 52-54.) JP Morgan Chase Bank, N.A. ("JPMC Bank"), which serves as custodian and fund accounting agent for each of the mutual funds housed within the JPM Trust, provides the Fund with an array of custodial and accounting services. (Id. ¶ 45.)
The Fund also has a board of trustees (the "Board") which oversees the Fund's activities, monitors its external service providers, and is charged with annually reviewing and approving the service agreements, including the fees charged to the Fund by such providers. (Id. ¶ 56.) The Board is comprised of twelve individuals, each of whom also serves as a trustee for 153 other mutual funds established by JPMIM and JPMC and housed within the JPM Trust and similar entities. (Id. ¶ 176.)
B. JPMIM's Investment Advisory Services
As the Fund's investment adviser, JPMIM provides a number of services related to the selection and management of the Fund's investment portfolio. For instance, JPMIM is responsible for researching potential investments for the Fund and deciding which securities to purchase or sell, at which times, and in what amounts. As the Fund's investment adviser, JPMIM also provides minor administrative and compliance-related services, as well as periodic reports to the Fund's shareholders and the Board concerning JPMIM's provision of portfolio selection services. (Id. ¶ 57.)
According to the Fund's November 1, 2016 prospectus, the Fund's investment objective is "to provide a high total return from a portfolio of selected equity securities." (Id. ¶ 60.) JPMIM seeks to accomplish that objective by pursuing a set of "principal investment strategies" which includes taking both long and short positions in domestic equity securities and derivatives.[3] Although the overall investment strategy employed by JPMIM for the Fund is "quite common," the use of short positions as well as long ones is "less common." (Id. ¶¶ 61-63.)
From 2005 through 2015, the Fund's investments were overseen by only two JPMIM portfolio managers. During that *161 time period, the Fund's net assets increased significantly from under $1 billion to more than $10 billion. (Id. ¶¶ 66, 126(a); see also id., Ex. E, ECF No. 1-6.) A third portfolio manager was added in 2016. (Id. ¶ 66.) The Fund's three portfolio managers are all managing directors of JPMIM and each is responsible for managing the day-to-day activities of a portion of the Fund's investments. (Id. ) The Fund's portfolio managers rely on a team of twenty-seven research analysts. (Id. ¶ 67.) The same analysts provide research to those portfolio managers responsible for managing the investment portfolios of other funds to which JPMIM provides investment advisory services. (Id. )
In addition to those services it provides to the Fund, JPMIM also provides investment advisory services to several other mutual funds and portfolios, such as the JPMorgan U.S. Equity Fund (the "JPM Equity Fund") and the PSF Select Fund (the "PSF Fund"). (Id. ¶ 85(a).) The JPM Equity Fund is a mutual fund housed within the JPM Trust and with whom the Fund shares many of the same external service providers. (Id. ¶ 89(a).) The PSF Fund is a registered investment company that, like the JPM Trust, houses within it multiple funds and portfolios. (Id. ¶ 95.) JPMIM was retained by the PSF Fund's investment adviser to provide sub-advisory services to the PSF Fund's Long/Short Large-Cap Portfolio (the "PSF Sub-Advised Fund"). (Id. )
C. JPMIM's Fee
The IAA entitles JPMIM to a fee for the investment advisory services it provides the Fund. The fee, which is represented by an annualized rate, is computed and accrued on a daily basis, but paid monthly. (Id. ¶ 72.) At all relevant times, the fee rate charged by JPMIM was .80% of the Fund's average daily net assets.[4] Significantly, JPMIM's fee rate does not include any "breakpoints," or points at which lower fees are assessed once the Fund's net assets exceed certain stated values. The fee rate is instead applied uniformly against all of the Fund's net assets. (Id. ¶¶ 73-74.)
JPMIM has, however, entered into fee waiver agreements with the JPM Trust with respect to certain of its mutual funds, including the Fund. Pursuant to these agreements, JPMIM is required to waive fees it is otherwise owed when pre-specified caps are exceeded.[5] (Id. ¶¶ 75-76.) On occasion, the fee waiver agreement reduces the fees owed to JPMIM by considerable amounts. During the last half of 2016, for example, the Fund was obligated to pay JPMIM $39.74 million in investment advisory fees. Of that sum, JPMIM waived $4.54 million, or about 11.5% of the total amount it was owed. (Id. ¶¶ 78, 83.)
Notwithstanding, Plaintiff claims that the fees JMPIM charges the Fund for investment advisory services are excessive and in breach of the fiduciary duty it owes the Fund under Section 36(b) of the ICA. (Id. ¶¶ 246-50.)
*162 II. LEGAL STANDARDS
To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. In deciding a 12(b)(6) motion, the court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.[6] See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC, 709 F.3d 109, 119-20 (2d Cir. 2013) ; Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). The court, however, need not credit "mere conclusory statements," Iqbal, 556 U.S. at 678, 129 S.Ct. 1937, nor must it give effect to "legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ).
III. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 36(b)
Section 36(b) "impose[s] upon investment managers a 'fiduciary duty' with respect to compensation received from a mutual fund ... and grant[s] individual investors a private right of action for breach of that duty." Jones v. Harris Assocs. L.P., 559 U.S. 335, 340, 130 S.Ct. 1418, 176 L.Ed.2d 265 (2010) (citing 15 U.S.C. § 80a-35(b) ). To state a claim under Section 36(b), a plaintiff must show that an "investment adviser [has] charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." Jones, 559 U.S. at 346, 130 S.Ct. 1418.
"[A]ll relevant circumstances" are considered in evaluating whether an investment adviser has breached its fiduciary duty by charging excessive fees. Id. at 347, 130 S.Ct. 1418. As the Supreme Court has emphasized, however, the standard for breach of fiduciary duty under Section 36(b) neither "call[s] for judicial second-guessing of informed board decisions" concerning fee agreements, nor does it require courts "to engage in a precise calculation of fees representative of arm's-length bargaining." Id. at 352, 130 S.Ct. 1418 (citations omitted). "[C]ourts are not well suited to make such ... calculations." Id. at 353, 130 S.Ct. 1418. Instead, courts apply the "workable standard" set forth by the Second Circuit in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir. 1982). See Jones, 559 U.S. at 353, 130 S.Ct. 1418. The Gartenberg decision identified a number of factors for courts to consider in determining whether investment advisory fees are excessive, including: "(1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees."
*163 Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 340 (2d Cir. 2006) (citations omitted).
A complaint "need not address all of the Gartenberg factors to survive a motion to dismiss if, when taken as a whole, [it] demonstrates a plausible claim for relief under § 36(b)." Kasilag v. Hartford Inv. Fin. Servs., LLC, No. 11-CV-1083 (RMB), 2012 WL 6568409, at *2 (D.N.J. Dec. 17, 2012) ; accord Hoffman v. UBS-AG, 591 F.Supp.2d 522, 539 (S.D.N.Y. 2008). Rather, the issue is whether the complaint alleges sufficient facts to plausibly support an inference that, in light of all the surrounding facts and circumstances, the adviser's fee is so disproportionately large relative to the services rendered that it falls outside the range of what could be negotiated at arm's length. See Paskowitz v. Prospect Capital Mgmt. L.P., 232 F.Supp.3d 498, 502 (S.D.N.Y. 2017) ; In re Blackrock Mut. Funds Advisory Fee Litig., No. 14-CV-1165 (FLW), 2015 WL 1418848, at *4 (D.N.J. Mar. 27, 2015) ; see also Gartenberg, 694 F.2d at 928 ("[T]he test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances.").
Plaintiff claims that an analysis of the Gartenberg factors demonstrates that the fees JPMIM charges the Fund for investment advisory services are excessive. A close examination of those factors, however, reveal that, although they may be substantial, Plaintiff's complaint fails to plausibly allege that the investment advisory fees JPMIM charges the Fund are "so disproportionately large that [they] bear[ ] no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." Jones , 559 U.S. at 346, 130 S.Ct. 1418.
A. Comparative Fee Structures
The first Gartenberg factor the complaint addresses is comparative fee structures. Plaintiff compares the fee rates JPMIM charges the Fund to two different metrics: (1) the fee rates paid by JPMIM's other mutual fund clients for whom it provides substantially similar investment advisory services as those that it provides the Fund; and (2) the fee rates paid by mutual funds not advised by JPMIM but whose "size, character[,] and investment strategy are comparable to the Fund['s]." (Compl. ¶ 85.)
With respect to the first category, Plaintiff points to the fees JPMIM charges the Fund for providing "substantially similar and in large part identical" investment advisory services as those it provides to the JPM Equity Fund and the PSF Sub-Advised Fund.[7] (Id. ) Plaintiff alleges that the Fund, the JPM Equity Fund, and the PSF Sub-Advised Fund all have nearly identical investment objectives, strategies, and portfolios and are managed by the same portfolio managers, who in turn rely on the same team of research analysts.[8] (Id. ¶¶ 89(c)-(f), 97(c)-(f).) The sole discernible difference among them is that while the Fund and the PSF Sub-Advised Fund pursue investment strategies that include taking both long and short investment positions, the JPM Equity Fund takes only long ones. (Id. ¶¶ 89(d), 97(d).) Notwithstanding *164 these similarities, JPMIM charges the Fund fee rates that are higher than those it charges the others; whereas JPMIM charges the Fund a fee rate of .80%, the PSF Sub-Advised Fund and the JPM Equity Fund are charged fee rates of .60% and .40%, respectively. (Id. ¶¶ 91, 99.)
As to the second category of comparative fee structures, Plaintiff cites data obtained from Bloomberg Finance L.P. ("Bloomberg"), which tracks information on more than 7,000 domestic mutual funds (the "Bloomberg Funds"). (Id. ¶ 105.) Bloomberg categorizes the Fund as one of 291 "U.S. equity large-cap blend funds." (Id. ¶¶ 106-07.) Based on available data about the Bloomberg Funds, Plaintiff alleges that the average fee rate for investment advisory services paid by those funds is .54%. (Id. ) When the group of Bloomberg Funds is narrowed to those mutual funds that have net assets in excess of $1 billion, which Plaintiff claims represents a "more apt comparison" to the Fund, the average investment advisory fee rate drops to .36%. (Id. ¶ 108.) In addition, Plaintiff alleges that the Fund pays the highest rate for advisory fees among its peers. (Id. ¶ 111; see also id., Ex. C-2, ECF No. 1-4.)
Defendant contends that Plaintiff's allegations rely on inapt fee comparisons. (Mem. at 11.) For example, Defendant argues that because the Fund pursues "a more complicated investment strategy" than the JPM Equity Fund by taking short investment positions as well as long ones, JPMIM provides the two funds with different investment advisory services. (Id. at 13.) Defendant also argues that Plaintiff's comparison to the fee rates paid by the Bloomberg Funds is similarly inapt because not all of those funds pursue short selling as a primary investment strategy.[9] (Id. )
The Supreme Court has indeed counseled courts to "be wary of inapt comparisons[ ]" between fee rates where the underlying services provided are different. Jones, 559 U.S. at 350, 130 S.Ct. 1418. Where "the services rendered are sufficiently different that a comparison is not probative," courts are instructed to "reject such a comparison." Id. That appears to be the case here, at least with respect to the Bloomberg Funds comparison; the complaint fails to identify how, if at all, the investment advisory services JPMIM provides the Fund are similar to those provided to the Bloomberg Funds by their respective investment advisers. Moreover, no facts are even alleged as to why those 291 mutual funds were selected to be compared with the Fund in the first instance. Since there is no basis for this Court to conclude what investment advisory services the Bloomberg Funds were provided with, and whether and to what extent they are similar to those provided to the Fund by JPMIM, the Bloomberg Funds comparison must be rejected.[10] ibr.US_Case_Law.Schema.Case_Body:v1">See *165 id. at 349-50, 130 S.Ct. 1418 ("[C]ourts may give [fee] comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require") (emphases added); see also Turner ex rel. Davis N.Y. Venture Fund v. Davis Selected Advisers, LP, 626 Fed.Appx. 713, 717 (9th Cir. 2015) (rejecting comparisons where the complaint failed to allege that the other mutual funds were provided with similar services or pursued similar investment strategies).
By contrast, the comparison to the fee rate JPMIM charges the JPM Equity Fund is appropriate. Accepting as true Plaintiff's allegations that the Fund and the JPM Equity Fund share nearly identical investment objectives, strategies, and portfolios, and are managed by the same portfolio managers who rely on the same market research analysis, Plaintiff has adequately alleged that the services JPMIM provides both funds are sufficiently similar for their fee rates to be compared. Defendant's argument concerning the different services it claims it provides the Fund and the JPM Equity Fund as a result of the two funds' different investment strategies is unavailing at this stage of the litigation. See Chill v. Calamos Advisors LLC, 175 F.Supp.3d 126, 135 n.7 (S.D.N.Y. 2016) (collecting cases); Goodman v. J.P. Morgan Inv. Mgmt., Inc., No. 14-CV-414 (GLF), 2016 WL 759654, at *8 (S.D. Ohio Feb. 26, 2016) (an evaluation of whether services are sufficiently similar "depends on evidence and ... is ill suited for a decision on a motion to dismiss"); In re Blackrock, 2015 WL 1418848, at *5 (the "ultimate weight" of the comparison between services provided "is not before the Court" at the pleading stage). In any event, even if the two funds do have different investment strategies, there is no basis in law or logic for concluding that the investment advisory services JPMIM provides them are different, especially where, as here, they are managed by the same three JPMIM employees. The comparison to the JPM Equity Fund's fee rate is therefore appropriate.
Nevertheless, Plaintiff's allegations as to comparative fee structures fail to plausibly suggest that the fees JPMIM charges the Fund for investment advisory services fall so outside the "range of what would have been negotiated at arm's-length[,]" Gartenberg, 694 F.2d at 928, as to render them impermissibly excessive. Plaintiff's allegations as to comparative fee structures boil down to the contention that because the fee rate JPMIM charges the Fund is higher than the fee rates JPMIM charges just two other funds-the JPM Equity Fund and the PSF Sub-Advised Fund-they are excessive. But merely because one or two mutual funds pay lower investment advisory fees than what the Fund pays does not suggest that the fee rate JPMIM charges the Fund is necessarily *166 outside "the range of what would have been negotiated at arm's-length[.]" Id. (emphasis added). See Amron, 464 F.3d at 345 (affirming dismissal of complaint that compared the challenged fee "to one ... fund"); In re Scudder Mutual Funds Fee Litig., No. 04-CV-1921 (DAB), 2007 WL 2325862, at *17 (S.D.N.Y. Aug. 14, 2007) (dismissing complaint that compared the challenged fee to the fee rates paid by four other funds). A contrary ruling would open the floodgates to Section 36(b) claims any time a shareholder could identify a mutual fund that pays a lower investment advisory fee than the fund he or she chooses to invest in.
At any rate, comparative fee structures are but one factor to be considered in determining whether fees are excessive. Moreover, because there is often little to no competition between investment advisers for mutual fund business, such comparisons shed little light on whether a particular fee is "so disproportionately large" as to constitute a breach of fiduciary duty in violation of Section 36(b). See Amron, 464 F.3d at 344 (citing Gartenberg, 694 F.2d at 929 ).
This factor therefore weighs in favor of dismissal.
B. Economies of Scale
The next factor the complaint addresses is whether the Fund has achieved economies of scale and, if so, whether JPMIM sufficiently shares those benefits with the Fund and its shareholders. (Compl. ¶¶ 125-45.) "[E]conomies of scale is a condition where the average per-unit cost of manufacturing a product declines as the total output increases." Sivolella v. AXA Equitable Life Ins. Co., No. 11-CV-4194 (PGS) (DEA), 2016 WL 4487857, at *56 (D.N.J. Aug. 25, 2016) ; see also Black's Law Dictionary (10th ed. 2014) (defining economies of scale as "savings resulting from the greater efficiency of large-scale processes"). "Section 36(b) was enacted in large part because Congress recognized that as [mutual funds' assets] grew larger, it became less expensive for investment advisers to provide ... additional services" and "Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale." Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 326-27 (4th Cir. 2001) (citing Fogel v. Chestnutt, 668 F.2d 100, 111 (2d Cir. 1981) ).
To meet her burden of showing that the Fund achieved economies of scale, Plaintiff "must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew." Hoffman, 591 F.Supp.2d at 540 (citing Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 411 (2d Cir. 1989) ); see also Amron, 464 F.3d at 345 (affirming dismissal, in part, because the complaint made "no allegations regarding to the costs of performing fund transactions or the relationship between such costs and the number of transactions performed"); In re Evergreen Mut. Funds Fee Litig., 240 F.R.D. 115, 121 (S.D.N.Y. 2007) (rejecting proposed Section 36(b) claim as futile where there were no allegations as to actual transaction costs). Once she has done so, Plaintiff must then also allege that the savings realized from economies of scale were not sufficiently shared with the Fund and its shareholders. Kalish v. Franklin Advisers, Inc., 742 F.Supp. 1222, 1239 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir. 1991).
Here, Plaintiff does neither. Plaintiff alleges that the sharp growth in the Fund's net assets from $69.2 million in 2006 to $9.86 billion in 2016 generated significant economies of scale. (Compl. ¶ 126-28.) But *167 Plaintiff alleges no facts concerning whether the per-unit costs of performing transactions for the Fund increased or decreased as the assets under management grew. Instead, Plaintiff alleges only that the growth in the Fund's size was not accompanied by a parallel growth in the advisory services provided by JPMIM. (Id. ¶¶ 127-35.) For example, Plaintiff alleges that although the Fund's net assets grew by over 600% from 2007 to 2016, the number of different investments in the Fund's portfolio increased by only 50%, from 212 to 319, while the portfolio itself changed very little from year to year. (Id. ¶¶ 129-31.) Plaintiff also alleges that during the same period, the Fund's investment objectives, strategies, and processes, as well as the number of individuals charged with managing the Fund's portfolio, all remained about the same.[11] (Id. ¶¶ 132-35.)
These allegations are insufficient to show that the Fund achieved economies of scale because they do not address the Fund's actual transaction costs and whether those costs increased or decreased as the assets under management grew. "Without such information, there is no way to determine whether any economy of scale even existed that could have been passed on to investors or whether there is another explanation for the statistics chosen by Plaintiffs." Hoffman , 591 F.Supp.2d at 540 (citing Krinsk, 875 F.2d at 411 ). Indeed, based on the addition of another portfolio manager in 2016, it is plausible that the cost for JPMIM to perform transactions for the Funds actually increased as the assets under management increased, suggesting that economies of scale were perhaps not achieved. Plaintiff's complaint thus fails to raise an inference that JPMIM's fees bear no reasonable relationship to the services rendered. See Mintz v. Baron , No. 05-CV-4904 (LTS), 2009 WL 735140, at *3 (S.D.N.Y. Mar. 20, 2009) (dismissing Section 36(b) claim where the complaint did not allege the defendant's "costs [ ]or the number of transactions during the relevant period").
Even if the Fund did realize economies of scale, Plaintiff fails to adequately allege that the benefits are not being shared with its investors. As the complaint itself explains, "Congress intended that the benefits of such economies of scale be shared with mutual fund shareholders[ ] through the use of breakpoints and/or other advisory fee rate reductions rather than be monopolized by investment advisers." (Compl. ¶ 116 (emphasis added).) Here, Plaintiff alleges that as the Fund's net assets increased in size, JPMIM reduced its advisory fee rate in 2015 from 1.00% to .80% of the Fund's average daily net assets and that pursuant to its fee waiver agreements with the JPM Trust, it has waived investment advisory fees owed by the Fund, in some cases by more than twenty percent. (See Compl., Ex. E.) Thus, to the extent economies of scale has been achieved, Plaintiff's own allegations "indicate[ ] some sharing of economies of scale with" the Fund and its investors. Paskowitz, 232 F.Supp.3d at 507.[12]
Accordingly, this factor, too, weighs in favor of dismissal.
C. The Nature and Quality of the Services Provided
With respect to the nature and quality of the services JPMIM provides to *168 the Fund, Plaintiff's allegations fare no better. Plaintiff attempts to gauge the nature and quality of JPMIM's investment advisory services by focusing solely on the Fund's investment performance, which according to the complaint, "was essentially middling." (Compl. ¶¶ 152-53; see also Opp'n at 22 (describing the Fund's performance as "mediocre").) But as the Second Circuit made clear in Amron, "allegations of underperformance alone are insufficient to prove that an investment advisor's fees are excessive." 464 F.3d at 344 (quoting Migdal, 248 F.3d at 327 ); see also Hoffman, 591 F.Supp.2d at 539 (noting that this factor requires more than mere allegations about "post hoc performance"). Moreover, Plaintiff does not even allege that the Fund underperformed its peers; it alleges only that the Fund performed about the same. These allegations are insufficient to raise an inference that the fees were so excessive as to violate Section 36(b). See Amron, 464 F.3d at 344 (factor not met where the complaint "fail[ed] to allege the Fund's performance is appreciably worse than comparable funds").
This factor thus weighs in favor of dismissal.
D. Profitability of the Fund to JPMIM
The fourth Gartenberg factor the complaint addresses is the profitability of the Fund to JPMIM. (See Compl. ¶ 155.) The complaint recognizes that because JPMIM is a wholly-owned subsidiary of JPMC, it does not publicly disclose its financial results or its profit margins. (Id. ) Nonetheless, and armed with no evidence of the costs JPMIM incurs to provide the Fund with investment advisory services, Plaintiff declares that JPMIM's profitability from advising the Fund "is so unusually high as to be excessive." (Id. ¶ 156.) Plaintiff purports to base this conclusion on three "particularized facts": (i) JPMIM charges the Fund a higher fee than it charges the JPM Equity Fund; (ii) the Fund's sharp asset growth has generated tremendous economies of scale, all of which have been monopolized by JPMIM; and (iii) the Fund's investment advisory fee rates are higher than all other comparable mutual funds pursuing similar investment strategies. (Id. ¶¶ 157-60.) In other words, Plaintiff claims the Fund must be profitable for JPMIM because the fees JPMIM charges the Fund are high.
These allegations, recycled from other portions of the complaint, are plainly insufficient to support liability under Section 36(b) for the reasons explained above. Moreover, none of these "facts" identified by Plaintiff plausibly suggest that the Fund has been particularly profitable for JPMIM. As such, this factor also weighs in favor of dismissal. See Amron, 464 F.3d at 344 (no showing as to profitability "without some allegation of the corresponding costs incurred in operating the funds"); see also Paskowitz, 232 F.Supp.3d at 506 (dismissing Section 36(b) claim, in part, because the complaint made "[n]o allegation ... about defendants' actual costs"); Hoffman, 591 F.Supp.2d at 539 (rejecting as "unsatisfactory" plaintiff's allegation that the defendant received a "windfall" absent "sufficient information for the [c]ourt to determine the profitability of [d]efendants").
E. Fall-Out Benefits
The next factor the complaint addresses is the so-called fall-out benefits enjoyed by JPMIM as a result of its relationship with the Fund. (See Compl. ¶ 161.) Fall-out benefits refer to "those collateral benefits that accrue to the [investment adviser] because of its relationship with the mutual fund."
*169 Jones, 559 U.S. at 344 n.5, 130 S.Ct. 1418 ; see also Hoffman, 591 F.Supp.2d at 538 n.30 (" 'Fall-out' benefits are those benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund.") (citation omitted). "The essence of fall-out benefits in the context of a § 36(b) claim is that, as a fiduciary, an investment adviser should share with the Fund revenue generated through ventures only made possible by the fiduciary relationship by reducing fees." Chill, 175 F.Supp.3d at 144.
According to Plaintiff, the Fund's captive relationship with JPMIM has yielded JPMIM with two fall-out benefits that would not have existed but for its relationship with the Fund. (Compl. ¶ 161.) First, as the "direct result" of serving as the Fund's investment adviser, JPMIM and its affiliates, including JPMDS and JPMC Bank, were engaged to provide numerous other services to the Fund pursuant to separate service contracts and for substantial pay. Second, as a result of the services it provides the Fund, JPMIM is able to provide the PSF Fund with a "clone" of the Fund-the PSF Sub-Advised Fund-at almost no extra cost and with significant profits. (Id. ¶¶ 162-69.)
As to the profits JPMIM realizes from the services it provides the PSF Sub-Advised Fund, Plaintiff's allegations can support an inference, albeit a weak one, that JPMIM enjoys a fall-out benefit to the exclusion of the Fund and its investors. See Chill, 175 F.Supp.3d at 144-45 (crediting allegation that investment adviser "was able to market the investment strategies and services originally generated for the Fund to other institutional clients at much lower costs and more competitive rates," but conceding that such a benefit may not be "relevant to the excessiveness of the Advisory Fees") (citations omitted).[13] Plaintiff's allegation as to the profits accruing to JPMIM and its affiliates for providing the Fund with other services, however, cannot properly be classified as fall-out benefits; JPMIM and its affiliates could just as likely have been so engaged regardless of whether JPMIM provided investment advisory services to the Fund. In fact, that JPMIM and its affiliates were engaged to provide the Fund with other services is far more likely attributable to the Fund having been established in part by JPMIM and it being housed within the JPM Trust than to JPMIM having been engaged to provide it with investment advisory services.
For these reasons, this factor is at best neutral, weighing in neither party's favor.
F. The Care and Conscientiousness of the Board's Decision Approving JPMIM's Fee Rates
The final Gartenberg factor the complaint addresses is the care and conscientiousness with which the Fund's Board approved JPMIM's investment advisory fee rates. (See Compl. ¶ 170.) As the Supreme Court held in Jones, courts considering claims brought under Section 36(b) "must take into account both procedure and substance." 559 U.S. at 351, 130 S.Ct. 1418 (citing 15 U.S.C. § 80a-35(b)(2) ). "Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process.... even if a court might weigh the factors differently." Jones, 559 U.S. at 351, 130 S.Ct. 1418 *170 (citations omitted). By contrast, "where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome." Id. Here, Plaintiff concedes that she has no independent knowledge of the circumstances under which the Board evaluated and approved the IAA and the investment advisory fee rates JPMIM charges the Fund. Instead, Plaintiff's allegations as to this factor rely entirely on a summary report of the Board's approval process set forth in the Fund's public SEC filings. (Compl. ¶¶ 183-84.)
The summary report indicates that as part of its annual review of the IAA and JPMIM's fee rates in August 2016, the Board engaged an independent management consultant to report on the performance of certain of the "J.P. Morgan Funds." (Id. at 74.) In addition, the summary report notes that the Board received and evaluated extensive materials from JPMIM, including performance and expense information compiled by Broadridge and Lipper, Inc., two independent providers of investment company data. (Id. ) According to the summary report, the Board reviewed the IAA with JPMIM representatives, in-house counsel to the JPM Trust, and outside legal counsel, the last of whom discussed the proposed agreement with the Board outside the presence of JPMIM representatives and provided the Board with a memorandum outlining the relevant legal standards for considering the IAA. (Id. at 75.) The Board held two in-person meetings, one in June and another in August of 2016, to review and consider the various data and reports before ultimately voting to approve the IAA. (Id. at 74-75.) According to the summary report, the Board found that JPMIM's compensation was "fair and reasonable and that the continuance of the [IAA] was in the best interests of [the Fund] and its shareholders." (Id. at 75.)
Plaintiff alleges, without any factual support, that this description does not accurately depict the Board's evaluation of the IAA, nor does it reflect the Board's efforts "to engage in a good-faith process designed to guard against taking excessive investment advisory fees." (Id. ¶ 186.) Also without any factual support, Plaintiff alleges that the Board's approval was based on "inaccurate and/or incomplete information." (Id. ) The remainder of Plaintiff's allegations do not address the Board's process for approving JPMIM's fee rates but instead focus on the merits of the Board's conclusions. (Id. ¶¶ 191-228.) Absent some evidence of a deficient approval process or that information was affirmatively misrepresented or withheld from the Board, these allegations are inadequate to support Plaintiff's claim and do not suggest a basis for this Court to reject the Board's considered findings as to JPMIM's fees. See Jones, 559 U.S. at 352-53, 130 S.Ct. 1418. Simply put, "Section 36(b) does not provide relief where more arduous bargaining could have resulted in lower fees." Paskowitz, 232 F.Supp.3d at 508. Rather, "it provides relief only where the fees charged are shown to be outside the range of what arm's length bargaining could produce." Id. Plaintiff here has failed to show that JPMIM's fees meet that standard. This final factor therefore weighs in favor of dismissal.
IV. CONCLUSION
Plaintiff's allegations fail to support the reasonable inference that Defendant JPMIM's investment advisory fees as to the Fund were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. Plaintiff has thus failed to state a claim for relief under Section 36(b)
*171 of the Investment Company Act. Defendant's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is GRANTED.
The Clerk of Court is directed to close the motion at ECF No. 14, and this case, accordingly.
SO ORDERED.

JPMIM is a wholly-owned subsidiary of J.P. Morgan Asset Management Holdings, which is in turn wholly-owned by JPMC. (Compl. ¶ 14.)

JPMIM provides investment advisory services and similar services for an array of mutual funds established by JPMC and JPMIM, as well as other funds not affiliated with either. (Compl. ¶ 15.)

As explained by the Fund's prospectus,
Selling stock short allows the Fund to more fully exploit insights in stocks that the Fund's adviser expects to underperform, as well as enabling the Fund to establish additional long positions while keeping the Fund's net exposure to the market at a level similar to a traditional "long-only" strategy. Short sales involve the sale of a security which the fund does not own in hopes of purchasing the same security at a later date at a lower price. To make delivery to the buyer, the Fund must borrow the security, and the fund is obligated to return the security to the lender, which is accomplished by a later purchase of the security by the Fund.
(Compl. ¶ 61.)

On September 1, 2015, JPMIM's fee rate was reduced from 1.00% to .80% of the Fund's average daily net assets. (See Compl., Ex. E) However, because Section 36(b) limits recoverable damages to those incurred one year before the action was brought-here, before April 26, 2016-this Court's analysis considers only the .80% fee rate. See 15 U.S.C. § 80a-35(b)(3).

The fee waiver agreement sets certain caps on the Fund's "total expense ratio" and, when the cap is exceeded, requires JPMIM to waive its fees sufficient to reduce the total expense ratio so that it no longer exceeds the cap. The Fund's "total expense ratio" is defined as the sum of all the fees the Fund must pay-not just those for investment advisory services-and operating expenses, divided by the Fund's net assets. (Compl. ¶ 76.)

"In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " Fishbein v. Miranda, 670 F.Supp.2d 264, 271 (S.D.N.Y. 2009) (quoting Brass v. Am. Film Tech, Inc., 987 F.2d 142, 150 (2d Cir. 1993) ).

Although JPMIM technically serves only as sub-adviser to the PSF Sub-Advised Fund, Plaintiff alleges that it provides the same investment advisory services it provides to the Fund. (Compl. ¶ 85.) In fact, Plaintiff alleges that JPMIM provides more extensive services for the PSF Sub-Advised Fund than it does for the Fund. (Id. ¶ 97(b).)

According to Plaintiff, JPMIM actually has a fourth portfolio manager overseeing the JPM Equity Fund's investments. (Compl. ¶ 89(e).)

In its moving papers, Defendant argues that the comparison of the Fund's fee rate to that of the PSF Sub-Advised Fund is inapt because " 'investment advisers and sub-advisers perform distinct services' and these 'differences alone justify' different fee arrangements." (Mem. at 15 (quoting Hoffman, 591 F.Supp.2d at 540 ).) At oral argument, however, Defendant abandoned that argument, conceding that "that is a question of fact" not capable of being resolved at the pleading stage. (Tr. of Oral Arg., ECF No. 35, at 16:21-25.)

In any event, Plaintiff's allegation that the fee rate JPMIM charges the Fund is above the average fee rate paid by the Bloomberg Funds misses the mark. It is well-settled that "charging a fee that is above the industry average does not violate Section 36(b)." Paskowitz, 232 F.Supp.3d at 504 ; see also Amron, 464 F.3d at 345 (rejecting as "inadequate" allegation that the challenged fee rate was above the "industry mean"); Gartenberg, 694 F.2d at 929 ("Reliance on prevailing industry advisory fees will not satisfy § 36(b)."). That a particular fee rate is above the industry average says nothing about where the challenged rate lies on the distribution of fee rates charged and thus cannot, by itself, establish that a particular fee is beyond "the outer bounds of arm's length bargaining[.]" Jones v. Harris Assocs. L.P. , 611 Fed.Appx. 359, 360 (7th Cir. 2015). Similarly unavailing is Plaintiff's allegation that, among its "peers," the Fund pays the highest investment advisory fee rate. True as that may be, it is not the test for determining liability under Section 36(b). Moreover, a review of the fee rates paid by the Fund's peers indicates that the rate JPMIM charges the Fund is just one basis point-or one one-hundredth of one percent-above the next highest one, and just five basis points above the next two. (See Compl., Ex. C-2.) These allegations do not suffice to show that the fee rates JPMIM charges the Fund are so outside the range of what could be negotiated at arm's length as to be actionable under Section 36(b).

In fact, however, as Plaintiff notes, a third individual was added in 2016 to manage the Fund's portfolio. (Compl. ¶ 135.)

That JPMIM's fee rate did not employ the use of breakpoints is of little significance. (See Pl.'s Opp'n to Mot. to Dismiss ("Opp'n"), ECF No. 25, at 19.) Although breakpoints may be an appropriate way for investment advisers to ensure that the benefits of achieving economies of scale are shared with the Fund and its investors, it is by no means the only way of doing so.

The inference is made even weaker by Plaintiff's concession that JPMIM actually reduced its fee rate in 2015 from 1.00% to .80%, thereby "shar[ing] with the Fund revenue generated through ventures only made possible by the fiduciary relationship." Chill, 175 F.Supp.3d at 144.