RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

NANCY GOODMAN and JACQUELINE PEIFFER
(18-3238); CAMPBELL FAMILY TRUST, JACK
HORNSTEIN, ANNE H. BRADLEY, CASEY LEBLANC, and
VALDERRAMA FAMILY TRUST (18-3239),

                      *Plaintiffs-Appellants*,

    *v.*

J.P. MORGAN INVESTMENT MANAGEMENT, INC. and JP
MORGAN FUNDS MANAGEMENT, INC.,

                      *Defendants-Appellees*.

> Nos. 18-3238/3239

─────────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
Nos. 2:14-cv-00414; 2:15-cv-02923—Edmund A. Sargus, Jr., District Judge.

Argued: January 16, 2019

Decided and Filed: March 30, 2020

Before: MERRITT, GIBBONS, and NALBANDIAN, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:** Andrew W. Robertson, ZWERLING, SCHACHTER & ZWERLING, LLP, New York, New York, for Appellants. Mark Holland, GOODWIN PROCTER, LLP, New York, New York, for Appellees. **ON BRIEF:** Andrew W. Robertson, Robin F. Zwerling, Susan Salvetti, ZWERLING, SCHACHTER & ZWERLING, LLP, New York, New York, Mathew R. Wilson, Michael J. Boyle, Jr., MEYER WILSON CO., LPA, Columbus, Ohio, for Appellants. Mark Holland, Michael K. Isenman, Valerie A. Haggans, Charles A. Brown, Elizabeth S. David, GOODWIN PROCTER, LLP, New York, New York, Steven W. Tigges, Stuart G. Parsell, ZEIGER, TIGGES & LITTLE LLP, Columbus, Ohio, for Appellees. Matthew A. Fitzgerald, MCGUIRE WOODS LLP, Richmond, Virginia, for Amicus Curiae.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   This case presents the question of whether J.P. Morgan Investment Management Company ("JPMIM"), as advisor of certain mutual funds, has breached its fiduciary duty under section 36(b) of the Investment Company Act ("ICA") by charging excessive advisory fees.

Nancy Goodman and Campbell Family Trust, the plaintiff-appellants, are shareholders in mutual funds (the "Funds").  JPMIM, the defendant-appellee, serves as adviser to the Funds and is paid an advisory fee.  In this role, JPMIM provides certain investment advisory services, such as managing the Funds' securities portfolio and researching potential investments.  Goodman and Campbell sued JPMIM under section 36(b) of the ICA, which allows mutual fund shareholders to bring a derivative suit against their fund's investment adviser on behalf of their fund, claiming that JPMIM charged excessive advisory fees.

Goodman and Campbell contend on appeal, as they did in the district court, that the fees JPMIM charged to advise the Funds were excessive under section 36(b), which imposes a fiduciary duty on advisers with respect to compensation for services.  To face liability under section 36(b), a shareholder must prove that the challenged fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.* (*Jones II*), 559 U.S. 335, 346 (2010).  To determine whether a challenged fee is "so disproportionately large" as to be unreasonable, the Supreme Court has instructed courts to consider all relevant factors, including those set forth in *Gartenberg v. Merrill Lynch Asset Management., Inc.*, 694 F.2d 923 (2d Cir. 1982). *Id.* at 348.

The district court considered the relevant factors according to *Gartenberg* and *Jones II* and determined that they collectively favored JPMIM.  We agree.  Goodman and Campbell urge us to disregard the implications of certain facts.  Instead of comparing the fees JPMIM charged to other mutual funds for its role as adviser, Goodman and Campbell ask us to compare the fees

JPMIM charged to other funds for its different role as subadviser. They allege that because JPMIM charges the Funds more than the Subadvised Funds, the fees charged to the Funds are excessive. But this comparison serves only to show that JPMIM charges different fees for dissimilar services with dissimilar risks and responsibilities. Goodman and Campbell thus fail to point to a genuine dispute of material fact. We therefore affirm the decision of the district court.

I.

The ICA regulates investment companies, including mutual funds. *See* 15 U.S.C. § 80a-1 *et seq.* A mutual fund is a pool of assets, typically consisting of securities, that belong to the investors, or shareholders, who hold shares in the fund. *Burks v. Lasker*, 441 U.S. 471, 480 (1979). Mutual funds usually have no employees of their own. *Jones II*, 559 U.S. at 338. Typically, a separate entity—an investment adviser—sets up the mutual fund, selects the fund's directors, manages its investments, and provides other advisory services for a fee. *Id.* Because of this unique relationship, it is difficult if not impossible for the mutual fund to maintain independence from and cut ties with its adviser. *Id.* "Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.* (quoting S. Rep. No. 91–184, p. 5 (1969)). To check the inherent risk of abuse in this structure, section 36(b) of the ICA provides:

> (b) For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services . . . . An action may be brought under this subsection by . . . a security holder of such registered investment company on behalf of such company, against such investment adviser . . . for breach of fiduciary duty . . . . With respect to any such action the following provisions shall apply:
>
> > (1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
> >
> > (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the

> shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.

15 U.S.C. § 80a-35(b)(1)–(2) (hereinafter section 36(b)).

In short, the ICA requires that a board of trustees, which must meet certain requirements, be set up to govern a mutual fund. *Id.* §§ 80a-2(a)(19), 80a-10. The board must act in the best interest of the shareholders and is tasked with negotiating advisory fees with the investment advisor on behalf of the mutual fund. *Id.* §§ 80a-15(c), 80a-35(a). To further curb abuse, section 36(b) imposes on investment advisers a fiduciary duty "with respect to . . . compensation for services." *Id.* § 80a-35(b). A fund shareholder may bring a suit against an investment adviser for breach of fiduciary duty but bears the burden of establishing that such a breach occurred. *See id.*

The Supreme Court set forth the standard for liability under section 36(b) in *Jones II*. An investment adviser faces section 36(b) liability when the advisory fee it charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones II*, 559 U.S. at 346. To determine if an investment adviser breached its fiduciary duty by charging excessive fees, courts consider "all relevant circumstances." *Id.* at 347. But as the Supreme Court has emphasized, Congress clearly signaled that the courts must avoid taking on a rate-setting role. *Id.* at 352. Under section 36(b), courts should not "second-guess[] . . . informed board decisions" concerning advisory fee agreements. *Id.* Nor should courts "engage in a precise calculation of fees representative of arm's-length bargaining," because they "are not well suited to make such . . . calculations." *Id.* at 352–53. Instead, *Jones II* instructs courts to "sharply focus[] on the question of whether the fees themselves were excessive." *Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1179 (8th Cir. 2012) (quoting *Jones II*, 559 U.S. at 352). To do so, courts should "identify the outer bounds of arm's-length bargaining and not engage in rate regulation." *Jones v. Harris Assocs. L.P.* (*Jones III*), 611 F. App'x 359, 360 (7th Cir. 2015) (on remand from the Supreme Court). Accordingly, *Jones II* approves of courts using the "workable standard" set forth in *Gartenberg*. 559 U.S. at 353.

The *Gartenberg* factors are: (1) the nature, extent, and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual fund to the adviser; (3) "fall-out" benefits, such as indirect profits to the adviser; (4) economies of scale achieved by the adviser as a result of growth in assets under the fund's management and whether savings generated from the economies of scale are shared with shareholders; (5) comparative fee structures used by other similar funds; (6) the level of expertise, conscientiousness, independence, and information with which the board acts. *Id.* at 344–45, 344 n.5.

*Gartenberg*'s factor-based approach reflects Congress's choice to "rely largely upon independent director watchdogs to protect shareholders interests." *Id.* at 353 (alteration omitted) (quoting *Burks*, 441 U.S. at 485). The *Gartenberg* factors are not exclusive nor is one factor dispositive. *See id.* at 347 (instructing courts to consider "all relevant circumstances"); *Gartenberg*, 694 F.2d at 929 ("To make this determination all pertinent facts must be weighed.").

## II.

The plaintiff-appellants in this consolidated action, including Goodman and Campbell, are shareholders in five mutual funds[1] managed in part by JPMIM. Each fund is an "open-end" management investment company, commonly known as a mutual fund, and is registered with the Securities and Exchange Commission ("SEC") under the ICA. The Funds do not have their own facilities or employees. Rather, they operate by contracting with external service providers.

The Funds are overseen by a Board of Trustees (the "Board"), which selected JPMIM to serve as the investment adviser to the Funds, pursuant to an investment advisory agreement ("IAA"). In return for its services, JPMIM receives an annual fee from each fund that is calculated monthly as a percentage of each of the fund's net assets under management ("AUM"). Although the parties disagree as to certain of the services JPMIM provides as advisor, they agree that the investment advisory services include researching potential investments and deciding

---

[1]The parties agree that five individual funds are still in dispute. The five remaining funds with claims for excessive advisory fees are the: (1) JPMorgan Core Bond Fund (the "Core Bond Fund"); (2) JPMorgan High Yield Fund (the "High Yield Fund"); (3) JPMorgan Mid Cap Value Fund (the "Mid Cap Value Fund"); (4) JPMorgan Large Cap Growth Fund ("Large Cap Growth Fund"); and (5) JPMorgan Value Advantage Fund (the "Value Advantage Fund").

which securities the Funds should purchase and sell. In 2014, the advisory fee rates set forth in the IAAs ranged from 0.30% to 0.65% of each fund's AUM. Each year, the Board reviews the IAAs with JPMIM, including the fees paid pursuant to the contract. The parties agree that JPMIM agreed to waive some portion of those fees.

The Goodman and Campbell plaintiffs brought separate suits, which the district court consolidated, against JPMIM for breaching its fiduciary duty to the Funds under section 36(b) of the ICA, alleging that JPMIM charged excessive advisory fees. Following the close of discovery, Goodman and Campbell moved for partial summary judgment. They sought a decision that, under *Jones II*, the advisory fees JPMIM charges to the Funds could be aptly compared to the advisory fees JPMIM charges to certain other funds (the "Subadvised Funds")[2] and asked the district court to give these comparisons "the weight they merit by the Court at trial." DE 111, Sealed Pls.' Mot. for Summ. J., Page ID 1119. Goodman and Campbell's key argument for summary judgment was that the fees charged to the Subadvised Funds unequivocally established the "arm's-length bargaining range" for JPMIM's advisory services described in *Jones II.* DE 111-1, Sealed Pls.' Br. in Supp. of Mot. for Summ. J., Page ID 3270. Therefore, Goodman and Campbell alleged, the fees JPMIM charged to advise the Funds were excessive under section 36(b) because they were higher than the fees JPMIM charged to sub-advise other mutual funds, even though JPMIM used the same investment strategy for the Funds and the Subadvised Funds.

JPMIM, in turn, moved for summary judgment on all of Goodman and Campbell's claims. JPMIM contended that two undisputed facts demonstrate that JPMIM did not violate section 36(b): (1) "the Funds delivered strong investment performance for their shareholders;" and (2) "the advisory fees . . . are in line with fees charged by similar mutual funds." DE 113, Sealed Defs.' Mot. for Summ. J., Page ID 2424. Furthermore, JPMIM argued that comparisons to the Subadvised Funds were inapt because the Subadvised Funds provided different services, for lower fees, than the Funds. JPMIM explained that as a subadviser, JPMIM "serves under the

---

[2]Certain financial institutions independently organize and sponsor their own mutual funds. In addition to serving as an adviser to the Funds, JPMIM sub-contracts to provide advisory services as a "subadviser" to certain of these institutional clients.

supervision of the institutional client, which operates as that fund's investment adviser. In other words, there are two levels of advisory services for the Subadvised Funds." *Id.* at 2429. According to JPMIM, because the Subadvised Funds have both an investment adviser and a subadviser, they have a "different structure" than the Funds. *Id.* at 2441. Therefore, JPMIM argued, Goodman and Campbell could not show the challenged fees were so excessive that they bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

In a thorough opinion, the district court conducted a *Gartenberg* analysis and granted summary judgment for JPMIM. The district court concluded that there was no genuine issue of material fact regarding whether the advisory fee was so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

III.

We review a grant of summary judgment *de novo*, using the same standard employed by the district court. *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 821 (6th Cir. 2015). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This court must view the evidence in the light most favorable to the non-moving party. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018). But to avoid summary judgment, the non-moving party must show that there is more than "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence" in support of the non-moving party does not establish a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The moving party is entitled to summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

IV.

Goodman and Campbell's main argument on appeal, as before the district court, is that the comparative fee structures and services provided to the Funds can be aptly compared to the Subadvised Funds. Making this comparison, they argue, indicates a genuine dispute of material fact as to whether JPMIM charged the Funds a disproportionately large advisory fee that cannot be explained by arm's-length bargaining. In support of that argument, they focus on the fifth and first *Gartenberg* factors: comparative fee structures and nature and quality of services provided.[3] They also point to the fourth and sixth *Gartenberg* factors: economies of scale and the process by which the Board considered and approved the fees. They do not put forth any evidence as to the final *Gartenberg* factor—fall-out benefits.

JPMIM argues that the Funds and Subadvised Funds are not comparable. Relying on the Seventh Circuit's reasoning on remand from the Supreme Court in *Jones III*, JPMIM contends that a comparison between the fees charged to the Funds and those charged to other, comparable funds shows that the fees at issue were not excessive. In *Jones III*, the Seventh Circuit found that the first and fifth *Gartenberg* factors—comparative fee structures and the nature and quality of services provided— "jointly suffice under the Supreme Court's standard" to require summary judgment for the adviser in an excessive fees case. 611 F. App'x at 361. That is, summary judgment for the adviser is warranted when (1) "undisputed evidence shows that [the adviser] delivered value for money" and (2) "the funds it was advising did as well as, if not better than, comparable funds." *Id.* JPMIM urges us to find that, here, these two factors "are particularly important and may be dispositive." CA6 R. 35, Appellee Br., at 25.

Today, we agree with the Seventh Circuit's reasoning about the importance of these two factors. And, as in *Jones III*, undisputed evidence shows these two factors are present in this case. But, per the instruction of the Supreme Court in *Jones II* that all relevant factors must be considered, we find these two factors are not dispositive standing alone. In conjunction with our analysis of the additional relevant *Gartenberg* factors and viewing the facts in the light most

---

[3]Goodman and Campbell brief performance and profitability separately but their arguments more aptly fit into a consideration of comparative fees and nature and quality of services provided, as explained below.

favorable to Goodman and Campbell, we conclude that they have failed to point to a genuine issue of material fact.

## A.

*Comparative fee structures and nature and quality of services provided.* The fifth and first *Gartenberg* factors are key to the resolution of this case. At the heart of consideration of these two factors is the question of which funds are comparable. Viewing the facts in the light most favorable to Goodman and Campbell, we conclude the district court did not err in determining that the Funds are not comparable to the Subadvised Funds but are comparable to certain other mutual funds that realized similar performance.

The fifth *Gartenberg* factor asks how the fee structure of the Funds compares to comparable funds. *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 982 (D. Minn. 2007), *rev'd and remanded*, 561 F.3d 816 (8th Cir. 2009), *cert. granted, judgment vacated*, 559 U.S. 1046 (2010), *and order reinstated sub nom. Gallus v. Am. Exp. Fin. Corp.*, No. CIV. 04-4498 DWF SRN, 2010 WL 5137419 (D. Minn. Dec. 10, 2010).

The first *Gartenberg* factor examines the nature and quality of the services provided by the adviser. *Id.* at 980. The inquiry into the nature of the funds depends upon a determination of what services may be permissibly considered. *See Zehrer v. Harbor Cap. Advisors, Inc.*, Nos. 14-C-00789 & 14-C-07210, 2018 WL 1293230, at *1–18, *10 (N.D. Ill. Mar. 13, 2018). To evaluate the quality of services provided to the funds, other courts have compared the performance of the challenged funds to peer funds. *See, e.g., Jones v. Harris Assocs. LP* (*Jones I*), 2007 WL 627640 (N.D. Ill. Feb. 27, 2007), *aff'd by Jones III*, 611 F. App'x 359. An indicator of good performance is when an adviser "deliver[s] value for money . . . as well as, if not better than, comparable funds." *Jones III*, 611 F. App'x at 361.

Goodman and Campbell argue that the Funds and the Subadvised Funds can be aptly compared and that such comparison creates a genuine issue of material fact as to whether JPMIM charged the Funds excessive advisory fees. They ask us to find that JPMIM provides essentially the same services, with the same risks, to both the Subadvised Funds and the Funds. Any purported differences in services, they argue, do not overcome the similarity of the

Subadvised Funds and the Funds.  Similarly, they contend that any differences in risks do not impact the aptness of the comparison.

Next, Goodman and Campbell argue that a comparison to advisory fees charged to other mutual funds, using Thomson Reuters Lipper ("Lipper") data, is not probative and "the type of comparison" the Supreme Court cautioned against in *Jones II.*  CA6 R. 26, Appellant Br., at 49–51.  The Lipper reports showed that the Funds outperformed similar funds and that the fees paid by the Funds were in line with those paid by similar funds.  Goodman and Campbell contend that these reports are irrelevant because Lipper does not indicate whether the fees paid by the comparison funds were negotiated at arm's length and does not consider the services provided.  In short, they argue that the contracts for the Sudadvised Funds show the bounds of fees set by an arm's-length negotiation; because the fees charged to the Funds are higher, they assert that the fees charged to the Funds violate section 36(b).

JPMIM argues that the comparison for which Goodman and Campbell advocate is inappropriate under the *Jones* cases. JPMIM contends that it provided different services, for different fees, to the Funds and the Subadvised Funds and that it assumed greater risks in managing the Funds than the Subadvised Funds.  JPMIM also alleges that Lipper is a commonly used, independent source of comparison data and that the Lipper data here accurately showed that the Funds outperformed comparable funds but kept management fees lower than, or in line with, those comparable funds.

We agree with JPMIM.  While the Supreme Court recognized that courts may give comparisons between the fees an adviser charges to different clients "the weight that they merit in light of the similarities and differences between the services that the clients in question require," it cautioned courts to avoid "inapt comparisons" and declined to establish "any categorical rule regarding the comparisons of the fees charged different types of clients." *Jones II*, 559 U.S. at 349–350.  The Supreme Court further instructed:

> If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison.  Even if the services provided and fees charged to an independent fund are relevant, courts should be

> mindful that the Act does not necessarily ensure fee parity between mutual funds and institutional clients contrary to petitioners' contentions.

*Id.* at 350.

The Supreme Court explained in a footnote that comparisons with fees charged to other clients will not "doom any fund to trial." *Id.* at 350 n.8 (internal quotation marks, citations, and alterations omitted). Trial is appropriate "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range." *Id.*

Summary judgment for JPMIM is warranted under the Supreme Court's decision in *Jones II*. While not binding on us, the Seventh Circuit's further explanation on remand in *Jones III* provides helpful guidance in this case. As in *Jones III*, Goodman and Campbell seek to avoid the implications of comparison to other, more similar funds. 611 F. App'x at 361. Rather, they want the court "to compare the fees that [the adviser] charged [the Funds] with the fees [the adviser] charged some of its other clients." *Id.*

JPMIM put forth clear evidence that the responsibilities JPMIM has as adviser to the Funds are different from those it has as subadviser to the Subadvised Funds, as are the associated risks. JPMIM's expert described in detail the risks and responsibilities JPMIM bears as adviser to the Funds versus subadviser to the Subadvised Funds. DE 117-5, Sealed Stulz Decl., Page ID 3164–65, ¶¶ 5–13. The evidence showed that the "liquidity risks, business risks, operational risks, pricing risks, litigation risks, regulatory risks, and reputational risks" all differed between the Funds and the Subadvised Funds. *Id.* at 3164, ¶ 4.

Furthermore, as to compliance services, JPMIM's expert explained that mutual funds are subject to complex regulations, which "create compliance costs for the advisers and administrators and create risks associated with accidental lack of compliance." *Id.* at 3189, ¶ 67. While a subadviser may also have certain compliance responsibilities, "they are generally lesser in scale and scope than the fund's adviser's compliance responsibilities." *Id.* In fact, "[s]ome of the subadvisory agreements are explicit about the fact that compliance obligations of the subadviser differ from those of the adviser." *Id.* at 3189, ¶ 68.

Similarly, Maria Connolly, the client portfolio manager for the Mid Cap Value Fund, explained that the decision-making process for each set of funds is wholly different. DE 117-4, Sealed Connolly Decl., Page ID 2929. Furthermore, while her team has no communication with the shareholders of the subadvised funds, she has "hundreds of meetings every year with investors of the [F]unds." *Id.* at 2931–32 (citation omitted).

In response, Goodman and Campbell's key argument is that whether a fee disparity is justified based on the provision of additional services is a fact question, precluding summary judgment here. In making this argument they point to no evidence but to two cases, neither of which makes Goodman and Campbell's argument more persuasive. Goodman and Campbell are correct that one of these cases—*Kasilag v. Harford Investment Financial Services, LLC*—denied summary judgment, but plaintiffs only "narrowly" survived summary judgment on the *Gartenberg* factors the district court found weighed in the plaintiffs' favor. Nos. 11-cv-1083 & 14-cv-1611, 2016 WL 1394347, at *17–19 (D.N.J. Apr. 7, 2016). The other case—*Kennis v. Metropolitan West Asset Management, LLC*—was an interlocutory order in a phased discovery. No. 15-cv-8162, slip op. at 2–3 (C.D. Cal. Sept. 11, 2017). The Supreme Court and Seventh Circuit's reasoning in the *Jones II* and *III* cases is far more pertinent here.

Relying on the Supreme Court's instruction that "[i]f the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison," *Jones II*, 559 U.S. at 350, we agree with the district court that the comparison between the Funds and Subadvised Funds is inapt. The Funds and Subadvised Funds involve not only different risks but also a differential in the scale of services associated with the roles of adviser and subadviser.

Goodman and Campbell aim to avoid that conclusion by arguing that Lipper, which prepared reports for the Board as part of its annual contract review process for the Funds, does not provide relevant comparison data. They do not dispute that the Funds experienced strong performance but instead allege that the fees charged to the Lipper comparators may not have been negotiated at arm's-length so they may not actually be comparable.

Lipper, however, is an independent provider of data that is widely accepted in the field as a tool to compare fees and performance in the mutual fund industry. *Kasilag v. Hartford Inv. Fin. Servs., LLC*, Nos. 11-cv-1083, 14-cv-1611, & 15-cv-1876, 2017 WL 773880, at *9 (D.N.J. Feb. 28, 2017) ("In its final analysis, the Court finds that the data from Lipper is reliable."); *see also Zehrer*, 2018 WL 1293230, at *12 (comparing the mutual fund's performance to Lipper data). Furthermore, both parties' experts explained that Lipper reports are widely used in the industry and they each had used Lipper data.[4] As the district court explained in detail, the Lipper data showed that the Funds had good performance, with average advisory fees, as compared to similar funds. In addition, JPMIM waived significant fees.

We find that the district court did not err in determining that two undisputed facts—which align with the fifth and first *Gartenberg* factors—are indicative, though not dispositive, that JPMIM did not charge excessive fees: (1) the fact that JPMIM's fees are in line with those of their peer groups; and (2) the fact that JPMIM provided a better than average rate of return than the peer groups once expenses (including advisory fees) are taken into account. *See Jones III*, 611 F. App'x at 360–61 (stating that two factors "jointly suffice under the Supreme Court's standard": (1) the funds' fees were similar to those charged by comparable funds; and (2) the funds' returns exceeded the average rate of return).

### B.

*Economies of scale.* The next relevant consideration is the fourth *Gartenberg* factor, which asks whether the Funds realized economies of scale and, if so, whether JPMIM sufficiently shared those benefits with shareholders and the Funds. JPMIM contends that only certain of the Funds realized economies of scale, which were shared with shareholders through the fee waivers. Goodman and Campbell, in contrast, assert that JPMIM realized significant economies of scale for all of the Funds. They do not contend that the economies of scale were not shared at all, but rather that JPMIM did not appropriately share the financial benefits from

---

[4]Dr. Ayres, Goodman and Campbell's expert, testified that although he did not wish to opine on the "general reliability" of Lipper data, he had used it in the past and did not recall any errors in Lipper data when he had used it. DE 113-33, Ayres Dep., Page ID 2632–33.

those economies of scale with shareholders.  The evidence Goodman and Campbell present is insufficient to show there is a genuine issue of material fact as to economies of scale.

Economies of scale result when, as a business grows, the cost of doing business relative to the cost of production decreases. *See Economy of Scale*, BLACK'S LAW DICTIONARY (10th ed. 2014).  In the mutual fund context, economies of scale may be realized when, as a mutual fund grows, the various costs of managing the fund—such as research, oversight, and compliance costs—decline.  "'Section 36(b) was enacted in large part because Congress recognized that as [mutual funds' assets] grew larger, it became less expensive for investment advisers to provide . . . additional services' and 'Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale.'" *Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*, 309 F. Supp. 3d 156, 166 (S.D.N.Y. 2018) (alterations in original) (quoting *Migdal v. Rowe Price–Fleming Int'l, Inc.*, 248 F.3d 321, 326–27 (4th Cir. 2001)), *aff'd*, 765 F. App'x 538 (2d Cir. 2019).

There are two sets of Funds at issue under the economies-of-scale factor: Equity Funds and Bond Funds.  JPMIM contends that only three of the Funds—the Equity Funds—realized economies of scale. To the extent that they were realized, JPMIM contends, they were passed on to the Funds and shareholders in the form of waivers.  JPMIM put forth statements from Dr. Ayres, Goodman and Campbell's expert witness, showing that although the Equity Funds experienced economies of scale, JPMIM shared the financial benefits from the economies of scale through fee waivers.  DE 113-33, Sealed Ayres Tr., Page ID 2627.

Goodman and Campbell point to testimony from Dr. Ayres indicating that, although the profits realized from economies of scale were shared through the waivers, Dr. Ayres "concluded that the fee waivers were *insufficient* to share economies of scale."  CA6 R. 26, Appellant Br., at 56.  He conceded that there was evidence of some sharing, including through the waivers, but that "wasn't sufficient to stop the profit rates from increasing on each of these equity funds . . . as they increased in size." DE 113-33, Sealed Ayres Tr., Page ID 2627.  Dr. Ayres explained that there are multiple methods to proportionately share profits realized from economies of scale.

Section 36(b) does not allow courts to test fees for "reasonableness." *Jones II*, 559 U.S. at 341. The role of the court here is not to act as a rate regulator that determines which of the methods for sharing economies of scale is the absolute best, *see Jones III*, 611 F. App'x at 360, but rather to determine if the fee charged is "disproportionately large," *Jones II*, 559 U.S. at 346. As to this factor, whether economies of scale could have been shared at a higher level is not the issue. *See Jones I*, 2007 WL 627640, at *9 ("[W]hether breakpoints could have been at a lower level is not the issue."). Rather, whether the board *could* have agreed to those levels after engaging in good faith negotiations is the issue. *See id.* ("The issue is whether the board could have agreed to the breakpoints being set at those levels after engaging in good faith negotiations. There is no indication that they could not . . . .").

Here, Goodman and Campbell's own expert admitted that JPMIM did share the profits from the Funds that experienced economies of scale through waivers. Although he thinks that this could have been done in a different way that shared more of the profits with shareholders, he testified that multiple acceptable methods of profit-sharing exist. Thus, to the extent the Funds have achieved economies of scale, Goodman and Campbell's own evidence "indicates some sharing of economies of scale with" the Funds and their shareholders. *Pirundini*, 309 F. Supp. 3d at 167 (quoting *Paskowitz v. Prospect Capital Mgmt. L.P.*, 232 F. Supp. 3d 498, 507 (S.D.N.Y. 2017)). Furthermore, there is "no indication" that the Board could not have agreed to the fee waivers realized from economies of scale "after engaging in good faith negotiation."

As to the remaining funds, JPMIM put forth statements from Dr. Ayres showing that the Bond Funds did not realize any economies of scale during the time period at issue. DE 113-33, Sealed Ayres Tr., Page ID 2626.

Goodman and Campbell did not put forth any evidence that the Bond Funds realized economies of scale and their arguments to the contrary are unavailing. They assert that Dr. Ayres "explained that while those funds have not seen their assets increase in recent years, those funds continue to benefit from economies of scale as a result of enormous growth in the years preceding this action." CA6 R. 26, Appellant Br., at 55. But Dr. Ayres said that the Funds did not realize economies of scale in the time period he analyzed, and he speculated only that there was "a substantial possibility" that the Funds realized economies of scale in past years that might

have carried over into the years relevant to this action.  DE 113-33, Sealed Ayres Tr., Page ID 2626.  While this may be true, Dr. Ayres's speculation is insufficient to establish a genuine issue of material fact.  Furthermore, referring to the Equity Funds, Dr. Ayres wrote in his expert report in the economies-of-scale section: "C. The Income Statements for Three of the At-Issue Funds Show Economies of Scale," implying that the other funds—the Mutual Funds—did not realize economies of scale.  DE 119-26, Ayres Expert Report, Page ID 3846.

Goodman and Campbell also argue that the lack of breakpoints in JPMIM's fee rate is further evidence that the economies of scale were not shared.  While not binding on us, the Southern District of New York explained in a similar case, in granting an adviser's motion to dismiss, "[t]hat JPMIM's fee rate did not employ the use of breakpoints is of little significance.  Although breakpoints may be an appropriate way for investment advisers to ensure that the benefits of achieving economies of scale are shared with the Fund and its investors, it is by no means the only way of doing so."  *Pirundini*, 309 F. Supp. 3d at 167 n.12 (citation omitted).

For the foregoing reasons, we conclude that the economies-of-scale factor weighs strongly against Goodman and Campbell.  The evidence they present regarding this factor is insufficient to create an issue of material fact.  Accordingly, we find that the district court did not err in finding this factor weighs in favor of granting summary judgment for JPMIM.

C.

*Board oversight.*  Last, the parties address the sixth *Gartenberg* factor, which analyzes the care and conscientiousness with which the Board approved JPMIM's investment advisory fee rates.  As the Supreme Court explained in *Jones II*, "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process . . . even if a court might weigh the factors differently."  559 U.S. at 351 (citation omitted).   In contrast, if a board's process was deficient or an adviser withheld important information, courts are instructed to take a closer look at whether the board functioned as an "independent check" on management.  *Id.* at 352 (citation omitted). However, "the standard for fiduciary breach under section 36(b) does not call for judicial second-guessing of informed board decisions."  *Id*.  To counter the effect of

evidence JPMIM raises as to the board process, Goodman and Campbell "must demonstrate that the flaws they find in what transpired would have made a legally significant difference." *Jones I*, 2007 WL 627640, at *9.

The district court found that the Board was made up of experienced, independent trustees who met several times per year to review and request information from independent third parties, including the Board's independent counsel, the Funds' Senior Officer and Chief Compliance Officer, as well as two independent providers of mutual fund data (Lipper and Casey Quirk). Goodman and Campbell argue that the district court ignored their proffered evidence in finding that the Board was diligent and informed when making the fee decisions. But their evidence shows that although JPMIM may not have presented to the Board all the information Goodman and Campbell wanted, the Board still engaged in a thoughtful review process that considered substantial information from JPMIM about the Funds and Subadvised Funds, as well as information from independent third parties. *See Gallus*, 497 F. Supp. 2d at 983 (noting that just because the "Board may have placed greater emphasis on [one portion of their analysis] than Plaintiffs would have liked, such evidence does not create a genuine issue of material fact that the process was not an arm's-length one."). As with the similar allegations in *Kasilag*, Goodman and Campbell's "quibbles with the Board's process really amount to no more than nit-picking the Board's process; they do not create a triable issue of fact with regard to the Board's independent approval of the fees." *Kasilag*, 2016 WL 1394347, at *10 (finding that board oversight was sufficient). Accordingly, this factor weighs in favor of summary judgment for JPMIM.

## V.

Summary judgment in favor of JPMIM is warranted. The undisputed material facts do not create an issue as to whether the challenged fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones II*, 559 U.S. at 346. Accordingly, we affirm the district court's decision granting summary judgment in favor of JPMIM.